# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Ephren White Taylor, II,<br>    Petitioner, | Case No. 20-cv-1364 (PJS/ECW) |
| v. | **REPORT AND RECOMMENDATION** |
| Warden J. Fikes,<br>*FCI Sandstone*,<br>    Respondent. | |

This action comes before the Court on Petitioner Ephren White Taylor, II's ("Petitioner" or "Taylor") Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Dkt. 1 ("Petition")), Respondent Warden J. Fikes' ("Respondent" or "Warden Fikes") Responses (Dkts. 34, 51), and Taylor's Replies (Dkts. 40, 43, 58). This case has been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the following reasons, the Court recommends dismissal of the Petition without prejudice.

## I.      BACKGROUND

### A.      Criminal Proceedings in the Northern District of Georgia

In October 2014, Taylor pleaded guilty to conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349 in the U.S. District Court for the Northern District of Georgia ("Northern District of Georgia court"). (*See Taylor* Dkts. 40, 65 at 1.)[1] On

---

[1]     Throughout this Report and Recommendation, references to the "*Taylor* Dkt." are to materials filed in *United States v. Taylor*, No. 14-CR-0217 (TCB/AJB) (N.D. Ga.) and all references to page numbers are to the CM/ECF pagination. Some of the materials

March 17, 2015, the Northern District of Georgia court held a sentencing hearing and

entered judgment on March 24, 2015, sentencing Taylor to 235 months of imprisonment,

followed by three years of supervised release.  (*See Taylor* Dkts. 64, 65 at 2-3.)  The

Northern District of Georgia court ordered Taylor to pay a $100 special assessment, "due

immediately," and over $15 million in restitution ("Restitution Order").  (*Taylor* Dkt. 65

at 1, 6.)  The Restitution Order states:

> Restitution is due and payable immediately. The defendant shall make
> restitution payments from any wages he may earn in prison in accordance
> with the Bureau of Prisons Financial Responsibility Program. If restitution is
> not paid in full at the time of [Taylor's] release, payment shall become a
> condition of supervised release to be paid at a monthly rate of at least
> $150.00, plus 25% of gross income in excess of $2,300.00 per month.

(*Id.* at 2.)

Taylor did not directly appeal the Restitution Order.  (*See generally Taylor* Dkt.)

In March 2016, however, Taylor moved under 28 U.S.C. § 2255 to challenge his sentence

and filed a motion for sentence reduction the next month.  (*Taylor* Dkts. 87, 91.)  The

United States of America also filed a motion seeking a sentence reduction in May 2016.

(*Taylor* Dkt. 97.)  On June 21 2016, the Northern District of Georgia court granted the

United States' motion and denied Taylor's, leaving Taylor with a 223-month sentence

("Sentence Reduction Order") (Dkt. 103), and the U.S. Court of Appeals for the Eleventh

---

cited herein are not attached to any materials provided to the Court in the present action.
They are publicly accessible online, however, and this Court may take judicial notice of
such public court records.  *See, e.g.*, *Graham v. U.S. Marshal*, No. 20-CV-1204
(WMW/LIB), 2020 WL 4060731, at *1 n.1 (D. Minn. June 29, 2020) (citing *Bellino v.
Grinde*, No. 18-CV-1013, 2019 WL 368398, at *1 n.1 (D. Minn. Jan. 30, 2019)), *R. & R.
adopted*, 2020 WL 4059889 (D. Minn. July 20, 2020).

Circuit affirmed both decisions in February 2018.  (*See* Dkt. 128; *see also United States v. Taylor*, 727 F. App'x 979, 979-81 (11th Cir. 2018) (per curiam)).

For his § 2255 motion, Taylor asserted various grounds relating to trial counsel's ineffective assistance and that the Northern District of Georgia district judge erred as to his plea agreement and sentencing.  (*See generally Taylor* Dkt. 87; *see also* Dkt. 146 at 4-12.)  In January 2019, a Northern District of Georgia magistrate judge entered a report and recommendation for denial of Taylor's § 2255 motion, and in March 2019, a district judge adopted that report and recommendation over Taylor's objections and later denied Taylor's motion for reconsideration of that ruling.  (*See Taylor* Dkts. 146 at 14, 151, 153 at 3, 154, 156, 163.)  The district judge also declined to issue Taylor a certificate of appealability ("COA").  (*See Taylor* Dkt. 153 at 3; *cf.* 28 U.S.C. § 2253(c) (establishing COA requirement).)  Taylor filed a notice of appeal from the March 2019 order, and sought a COA regarding his § 2255 motion from the Eleventh Circuit.  (*See Taylor* Dkt. 157.)  The Eleventh Circuit denied Taylor's request for a COA as to his § 2255 motion.[2] (*See* Dkt. 204; *see also Taylor v. United States*, No. 19-11082-J, 2020 WL 5634307, *1 (11th Cir. June 15, 2020)).

In December 2019, Taylor filed a motion to modify the Restitution Order pursuant to 18 U.S.C. § 3664(k), claiming in part that the Restitution Order is unlawful;

---

[2]    Taylor filed a number of other motions in the Northern District of Georgia, denials of which have led to various additional notices of appeal.  (*See, e.g.*, *Taylor* Dkt. 164, 172, 174-76, 178, 181, 183-84, 187, 201, 214, 216, 222, 225, 226, 227.)  For the reasons stated in the Court's December 2020 Report and Recommendation, the Court does not discuss those motions or appeals.  (*See* Dkt. 13 at 3-4 n.3.)

improperly delegates authority to the Bureau of Prisons; and is unclear as to the "payment schedule during his time of incarceration, pre-release custody, and supervised release." (*Taylor* Dkt. 177 at 1-4.)  The Northern District of Georgia denied that motion on February 28, 2020, and while Taylor appealed that order, he did not appeal the portion of the order denying his request to modify the Restitution Order.  (*Taylor* Dkt. 193 at 2-6, 11; Dkt. 196 at 2-5.)

## B.    Proceedings in the District of Minnesota

On May 26, 2020, Taylor filed a Petition under 28 U.S.C. § 2241 in this Court, naming as Respondent J. Fikes—the Warden of the Federal Correctional Institution at Sandstone, Minnesota ("FCI-Sandstone"), where Taylor resided when he filed the Petition.  (Dkt. 1.)  Taylor filed a supporting memorandum on the same day.  (Dkt. 2.)

Taylor asserts three grounds in his Petition.  In its Order and Report and Recommendation issued on December 10, 2020 ("December 2020 R&R"), the Court recommended dismissal without prejudice of Ground 2 for lack of jurisdiction, as well as dismissal without prejudice of Ground 1 to the extent "Taylor claims that his release date, as calculated by the Federal Bureau of Prisons under the First Step Act, is incorrect." (Dkt. 13 at 15.)  U.S. Chief District Judge Patrick J. Schiltz adopted that recommendation on February 3, 2021.  (Dkt. 30 at 12.)  Accordingly, the Court only discusses and makes recommendations as to the remaining claims in the Petition in this Report and Recommendation.

Ground 1 of the Petition asserts that the Federal Bureau of Prisons ("BOP") "has improperly calculated [Taylor's] sentence [and] term of custody by failing to award good

conduct time. . . ." as well as First Step Act ("FSA") earned "time credit towards [his] pre-release custody." (Dkt. 1 at 10-11 ¶ 13 (capitalization amended); *see also* Dkt. 2 at 3 ¶ 3.) Taylor contends that a failure to properly calculate his good conduct time ("GCT") results in "approximately 126 days (4.2 months) of GCT that is missing" and suggests that the BOP has not awarded him appropriate FSA earned time credits ("FSA Credits") for participating in certain programs and that these issues affect not just his release date, but also his "custody classification, CARES ACT-COVID eligibility and prison security level." (Dkt. 2 at 3 ¶¶ 4-7.) As discussed above, Ground 1 has been dismissed as to the release date. However, notwithstanding Taylor's failure to explain how the alleged "failures to properly calculate good conduct time, or to credit program participation, affect his custody classification, 'CARES ACT-COVID eligibility,' or prison security level," the Court ordered Warden Fikes to respond to Ground 1 as it relates to those topics. (Dkt. 13 at 7, 16.)

Ground 3 suggests that the Restitution Order is "unlawful as it did not specify a payment schedule" and because it states "[r]estitution is due and payable immediately." (Dkt. 2 at 7 ¶ 38.) Taylor claims that the BOP "lacks the authority to collect restitution payments" through the BOP's Inmate Financial Responsibility Program ("IFRP")[3] in the manner in which the BOP is handling Taylor's restitution payments and that the BOP is

---

[3]    In the December 2020 R&R, the Court noted that Ground 3 could be read as including a challenge to the BOP's **general** authority to collect restitution payments under the IFRP, rather than just a **specific** challenge to how the BOP is handling Taylor's payments, but ultimately concluded that "[a]fter reading the relevant portions of Taylor's filings, . . . the Court believes that the correct view is that Taylor is only raising . . . a specific challenge to how the BOP is handling his payments." (*See* Dkt. 13 at 5 n.5.)

"failing to follow the U.S. District Court's order that restitution be only taken from [Taylor's] prison wages." (*Id.* at 7-8 ¶¶ 33, 37; Dkt. 1 at 11 ¶ 13.) According to Taylor, before May 2019, his IFRP payments "were based upon his prison wages and set at $25 per quarter." (Dkt. 1 at 11 ¶ 13.) In May 2019, however, after his transfer to FCI-Sandstone, "prison officials increased [Taylor's] amount to $100 per month." (*Id.*) Taylor contends that this was unaffordable and led him to "withdr[a]w from the IFRP." (*Id.*) In light of this withdrawal, Taylor asks this Court to order "the BOP . . . to not include restitution in its [calculations] until the sentencing court corrects its judgment." (Dkt. 2 at 8 ¶ 39.)

In the December 2020 R&R, the Court ordered Warden Fikes to provide Respondent's "views as to both this Court's jurisdiction to address Ground 3, as well as its view on Ground 3's merits." (Dkt. 13 at 15.) The Court also ordered Warden Fikes to provide a recommendation as to whether an evidentiary hearing should be conducted in this case, and ordered Taylor to file a reply to Warden Fikes' response within 30 days of the date the response was filed, should he intend to file one. (*Id.* at 16.)

On October 19, 2020, Taylor filed a motion for leave to supplement the Petition, as well as a supplemental brief and supporting exhibits ("Motion to Supplement"). (Dkts. 8-11.) That Motion did not substantially change the requests in Taylor's Petition and was granted. (Dkt. 13 at 5-6.)

On December 23, 2020, Taylor filed an Objection to the December 2020 R&R; Warden Fikes responded to Taylor's Objection on January 6, 2021; Taylor filed a Reply to the response on January 21, 2021; and Warden Fikes sought leave to file a Sur-Reply

on January 29, 2021.  (Dkts. 16, 18, 23, 27.)  On December 28, 2020, Taylor filed

"Petitioner's Judicial Notice of Adjudicative Facts (Federal Rules of Evidence 201(b))"

("Judicial Notice Motion") asking the Court to take judicial notice of the Northern

District of Georgia's and Eleventh Circuit's dockets as well as certain case law.  (Dkt.

17.)  The Judicial Notice Motion also asked the Court to conduct an evidentiary hearing

on that motion.  (*Id.* at 5.)  On February 3, 2021, Chief Judge Schiltz overruled Taylor's

Objection to the December 2020 R&R, adopted the December 2020 R&R in its entirety,

and granted Taylor's Judicial Notice Motion insofar as Taylor asked the Court to take

judicial notice of the Northern District of Georgia's and Eleventh Circuit's dockets as

well as the case law on which Taylor relied.  (Dkt. 30 at 12-13.)  Chief Judge Schiltz

denied the Judicial Notice Motion in all other respects, declined to consider Taylor's

Reply, and denied Warden Fikes' request for leave to file a Sur-Reply.  (Dkt. 30 at 7 n.5,

12-13.)

On January 8, 2021, the Court granted Warden Fikes' request for a 30-day

extension of time to file a response to the Petition, until February 10, 2022.  (Dkts. 19,

22.)  In the meantime, on February 5, 2021, Taylor filed a Motion for Sanctions Pursuant

to the Court's Inherent Authority asserting that Warden Fikes' counsel failed to disclose

adverse case law to the Court.  (Dkt. 31.)  Chief Judge Schiltz denied that motion on

February 9, 2021.  (Dkt. 33.)[4]

---

[4]    Taylor sought to withdraw his sanctions motion on February 10, 2021.  (Dkt. 38.)
Because Chief Judge Schiltz had already denied Taylor's motion for sanctions on

On February 10, 2021, Warden Fikes filed a Response to Taylor's Petition along with certain declarations, and Taylor filed his Reply and supporting exhibits on February 22, 2022, which he supplemented on March 2, 2021 ("Supplement").  (Dkts. 34-36, 40-41, 43.)  Taylor filed a notice of change of address on March 2, 2021, showing he was transferred to the Federal Correctional Institution at Oxford Satellite Camp in Oxford, Wisconsin ("FCI-Oxford").  (Dkt. 42.)

As to Ground 1, Warden Fikes argued in the Response that the BOP was not required under the FSA to award any earned time credits until January 15, 2022.  (Dkt. 34 at 2-3, 9-10.)  Because the January 15, 2022 deadline had expired, on March 17, 2022, the Court ordered Warden Fikes to file an update by March 24, 2022 "stating the BOP's calculation for and award of any FSA Earned Time Credits to [Taylor]."  (Dkt. 45 at 4.)  The Court also ordered Warden Fikes to "address the effect of the January 15, 2022 deadline's expiration on the Petition, including as to ripeness and mootness," and ordered Taylor to file a response to Warden Fikes' update no later than 30 days after the update is filed, addressing the ripeness and mootness of his Petition and to "state which grounds of his Petition he continues to assert (keeping in mind the earlier dismissal of part of Ground 1 and Ground 2)."  (*Id.*)

Warden Fikes sought a 7-day extension of time to file the required update, which the Court granted, making the update due March 31, 2022.  (Dkts. 46, 49.)  On March 29,

---

February 9, 2021 (Dkt. 33), he denied Taylor's request to withdraw the motion as moot on February 11, 2021 (Dkt. 39).

2022, Warden Fikes filed the update ("Update") along with a supporting declaration. (Dkts. 51-52.)  On April 25, 2022, the Court granted Taylor's request for an extension of time to file a response to the Update, and on May 20, 2022, Taylor filed a response which he amended on June 6, 2022 ("Response to Update").  (Dkts. 54, 56, 57-58.)

## C.    The Parties' Arguments

In the Response, Warden Fikes contends that the Court has jurisdiction over the remaining claims in this case, that Taylor's GCT and FSA Credits do not affect his custody classification, CARES Act home confinement eligibility, or prison security level, and that the BOP properly determined Taylor's IFRP payments based on Taylor's financial resources.  (Dkt. 34 at 1, 9-14, 11 n.6 (citing *Matheny v. Morrison*, 307 F.3d 709, 711-12 (8th Cir. 2002) ("The Eighth Circuit has held that the Court does have jurisdiction. In *Matheny* . . ., the Court held that claims challenging the IFRP's payment schedule 'concerns the execution of sentence, and are therefore correctly framed as § 2241 claims brought in the district where the sentence is being carried out.")).)  Warden Fikes argues that Taylor failed to support his allegations with any facts, legal citation, or arguments and as a result, Taylor's claims should be summarily denied, and an evidentiary hearing is unnecessary because the issues may be resolved on the basis of the record.  (*Id.* at 9, 14.)  Warden Fikes also addressed Grounds 1 and 3 on substantive grounds and Taylor replied as to Grounds 1 and 3, as summarized below.

1. **Ground 1—Effect of Taylor's GCT and FSA Credits on His Custody Classification, CARES Act Home Confinement Eligibility, and Prison Security Level**

As to Ground 1, Warden Fikes begins by noting that GCT and FSA credits are separate and distinguishable. (Dkt. 34 at 3 n.2 (citing 18 U.S.C. § 3624(b)).) Warden Fikes states that BOP staff re-calculated Taylor's sentence on July 15, 2017 to reflect a projected release date of May 25, 2031 based on the Sentence Reduction Order, and that in April 2020, BOP staff again re-calculated Taylor's sentence to reflect his GCT consistent with the FSA, resulting in a projected release date of January 16, 2031. (*Id.* at 2; *see also* Dkt. 36 ¶¶ 5, 6 (Decl. of Dawn Giddings); Dkt. 36-3, Ex. C at 1 (May 25, 2031 release date as of Aug. 31, 2016); Dkt. 36-4, Ex. D at 1 (recalculated Jan. 16, 2031 release date as of Jan. 28, 2021); Dkt. 52 ¶ 2 (Decl. of Leann Reynolds); Dkt. 52-1, Ex. A at 1 (showing Jan. 16, 2031 release date as of March 22, 2022).)

As for Taylor's FSA Credits, Warden Fikes initially argued in the Response that Taylor's request for relief in the Petition (filed on May 26, 2020) should be denied as premature and unripe because the BOP was not required under the FSA to award any earned time credits until January 15, 2022. (Dkt. 34 at 9-10.) However, in the Update, Warden Fikes argues that Ground 1 should be dismissed as partially moot because Taylor's FSA Credits have now been calculated. (Dkt. 51 at 1, 6.) Warden Fikes also argues that Ground 1 should be dismissed as partially premature and unripe because Taylor is not entitled to have his FSA Credits applied to his sentence because the credits, which the BOP calculates as 450 days as of February 26, 2022, do not equal the remainder of his sentence given that his current projected release date is not until 2031.

(*Id.* at 1, 6-8; *see also* Dkt. 52 ¶¶ 9, 11 (Decl. of Leann Reynolds).)  Warden Fikes states in the Update that "Taylor is on the waiting list for, is participating in, and has completed numerous evidence-based recidivism reduction programs and productive activities."  (*Id.* at 6.)  Warden Fikes identifies the following three periods for when Taylor "was taken out of [time credit] earning status": (1) May 10, 2019 to May 22, 2019, while he was being transferred between BOP institutions; (2) December 5, 2019 to July 14, 2020, when he was in refuse status for the IFRP; and (3) September 20, 2021 to September 23, 2021, when he was housed at an outside hospital.  (Dkt. 51 at 6; *see also* Dkt. 52 ¶ 11 (Decl. of Leann Reynolds).)

Warden Fikes asserts in the Response that at the time Taylor filed his Petition, he had more than ten years remaining on his sentence, and was thus incarcerated at FCI-Sandstone (a low security facility) "[p]ursuant to BOP Program Statement 5100.08 *Inmate Security Designation and Custody Classification*."  (Dkt. 34 at 3.)  Warden Fikes also contends that as of January 16, 2021, Taylor had less than ten years of incarceration time left and as a result, at the time the Response was filed, Taylor's Unit Manager had "started the process to re-score Taylor and have him lowered to a security level assignment of Minimum, which will allow for a transfer to a BOP Minimum security camp."  (*Id.* at 3-4.)

In the Update, Warden Fikes states that Taylor "was initially assigned a Low on the PATTERN Risk Tool but has been a Minimum since April 28, 2021."  (Dkt. 51 at 5; *see also* Dkt. 52 ¶ 5 (Decl. of Leann Reynolds); Dkt. 52-2, Ex. B at 1 (Taylor's FSA History showing a minimum risk recidivism level as of April 28, 2021).)  According to

Warden Fikes, Taylor's rights are not being violated and he therefore does not have valid habeas claims.  (Dkt. 34. at 10.)

As to home confinement, Warden Fikes contends that 18 U.S.C § 3624(c)(2) and 34 U.S.C. § 60541 provide the BOP with statutory authority to transfer prisoners to home confinement and also sets forth limitations as to that authority.  (*Id.* at 4.)  According to Warden Fikes, in accordance with "the Attorney General's March 26, 2020 and April 3, 2020 directives issued in light of the COVID-19 pandemic, the BOP immediately began reviewing all inmates with COVID-19 risk factors, as described by the Centers for Disease Control and Prevention (CDC), to determine which inmates are suitable for home confinement."  (*Id.* at 4-5; *see also* Dkt. 35 ¶¶ 3-15 (Decl. of Derrick Lee-Lo); Dkt. 35-1, Ex. A (Office of Attorney General March 26, 2020 Memorandum for BOP); Dkt. 35-2, Ex. B (Office of Attorney General April 3, 2020 Memorandum for BOP).)  As of the date of the February 10, 2021 Response, the BOP was prioritizing inmates who either: (1) have served 50 percent or more of their sentences; or (2) have 18 months or less remaining on their sentences and have served 25 percent or more of their sentences.  (Dkt. 34 at 5; *see also* Dkt. 35 ¶ 17; Dkt. 35-4, Ex. D at 2 (BOP Home Confinement Memorandum).)  Warden Fikes argues in the February 10, 2021 Response that Taylor does not qualify for "home confinement consideration because he had only served 37 percent of his term of imprisonment and is not due for release until 2031."[5]  (Dkt. 34 at 5;

---

[5]      Based on the Court's calculations, Taylor has now served approximately 48.68% of his sentence.

*see also* Dkt. 35 ¶ 23 (Decl. of Derrick Lee-Lo); Dkt. 35-6, Ex. F at 2.)  In the Update, Warden Fikes contends that an inmate's FSA Credits are not considered part of the time served component of the inmate's sentence for purposes of CARES Act home confinement eligibility.  (Dkt. 51 at 8.)

Warden Fikes maintains in the Update that Ground 1 is premature and unripe because Taylor is not eligible to have his FSA Credits applied to his sentence at this time, as the FSA explicitly limits a prisoner's ability to apply time credits until the number of credits earned is equal to the remainder of his/her term of imprisonment.  (*Id.* at 1, 6-7.) Warden Fikes argues that Taylor is not scheduled for release from BOP custody until January 16, 2031 and that while his 450 days of FSA Credits "could afford him additional time in pre-release custody and potentially advance his release date," Taylor's current Minimum PATTERN score could increase prior to his FSA Credits equaling the remainder of his sentence and he could also be subjected to disciplinary action, which could impact his ability to apply his FSA Credits to his sentence.  (*Id.* at 7-8.)

In the Reply, Taylor "concedes that his GCT was updated during the proceedings." (Dkt. 40 at 2.)  Taylor argues that the Court "directed the Government to address the supplemental petition and specifically how the case of *Goodman v. Ortiz*," Civ. No. 20-7582 (RMB), 2020 WL 5015613, at *1 (D.N.J. Aug. 25, 2020), applies to this matter. (*Id.* at 1.)  As a result, Taylor argues that Warden Fikes has "concede[d] the facts and applications of *Goodman* . . . and its implications upon Petitioner's sentence."  (*Id.*)

Taylor also argues in the Reply that Respondent failed to address his eligibility for FSA and his FSA Credits, and citing to *O'Bryan v. Cox*, 4:20-CV-04183-LLP, 2021 WL

983241, *1 (D.S.D. Jan. 12, 2021), argues that his FSA credits were to be credited prior to January 15, 2022, and if credited, would make him eligible for home confinement or temporary furlough release "during the C[OVID]-19 emergency status of the BOP." (*Id.* at 2-3.) Taylor argues that he has scored as a "Low risk for recidivism under the PATTERN risk assessment system" and qualifies for 15 days of earned time credits to be applied to his sentence for every 30 days of programming under the FSA. (*Id.* at 3.) Accordingly, Taylor contends in the Reply that he is entitled to over "360" days of earned time credits due to his completion of over "720 days of programming,"[6] which would thereby alter his release date, custody level, and his eligibility for home confinement based on the change in the percentage of time served. (*Id.* at 1-3.) In the Supplement, Taylor asserts that his exhibits show he participated in certain programs that entitle him to FSA Credits, which "would significantly alter [his] release date." (Dkt. 43 at 1-2 ¶¶ 1-8.)

In the Response to Update, Taylor acknowledges he has now been calculated as having 450 days of FSA Credits but maintains that Ground 1 is not moot because the BOP improperly failed to award him credits due to his institution to institution transfer from May 10 to May 22, 2019, while he was on IFRP refusal status between December 5, 2019 and July 14, 2020, while he was hospitalized due to COVID-19 complications from

---

[6]    The Courts notes that in his Reply, Taylor asserts both that he is entitled to "365 days of [e]arned [t]ime [c]redits to his sentence as a result of over 730 days of programing" and that he is entitled to "approximately 360 [d]ays of [e]arned [t]ime [c]redits" as a result of "approximately 720 [d]ays of programming." (*See* Dkt. 40 at 1, 3.)

September 20 to September 23, 2021, and is not moot due to his "CARES ACT Eligibility calculation for consideration of early release." (Dkt. 58 at 1.) Taylor argues that Respondent did not provide any authority to support the decision to withhold his FSA Credits due to him being in IFRP refusal status; that nowhere in the FSA does it state that earned time credits would be denied due to being in refuse status; that Respondent retroactively denied him FSA Credits but "failed to give adequate notice of the forfeiture or suspension of FSA Earned Time Credits if he entered refused status" and that moreover, the lawfulness of the Restitution Order is in dispute; and that Respondent's failure to award him FSA Credits while in refusal status "will trigger an Ex Post Facto claim." (*Id.* at 2.) Taylor further argues that he should not be punished for being hospitalized due to COVID-19 complications and that he "recently petitioned the administration using the administrative remedy system to have the credits re-applied to his sentence." (*Id.* at 3.)

Taylor states in the Response to Update that Ground 1 of his Petition is premised on the BOP's miscalculation of his sentence "due to missing Earned Time Credits under the [FSA]" and the BOP's failure to "reduce his sentence by one year so that he would be eligible for CARES ACT consideration at the 50% threshold." (*Id.* at 1.) Taylor argues that in light of "Executive Order 14074 signed by President Biden [on May 25, 2022] directing specifically that Respondent identify every inmate who meets the eligibility requirements under the CARES ACT," he has a liberty interest in having his sentence properly calculated and reduced by 12 months under the FSA based on his "well over 15 months" (450 days) of earned time credits, and if reduced, given that he has served over

86 months of his sentence, would put him well over the 50% threshold for consideration for CARES Act home confinement . (*Id.* at 1-2.)

## 2.     Ground 3—Restitution Order and Taylor's IFRP Payments

Warden Fikes argues that the Restitution Order is valid, that the BOP is properly deducting Taylor's restitution payments from his IFRP funds, and, citing to *United States v. Vanhorn*, 344 F.3d 729, 730 (8th Cir. 2003), contends that the Eighth Circuit has found such a deduction permissible. (Dkt. 34 at 11-13.) Warden Fikes further argues that the Restitution Order does not require an express limitation that Taylor's IFRP payments "come 'only' from his prison wages" as asserted by Taylor and because the IFRP pulls from prison wages as one funding source, the "BOP is complying with the order and making restitution payments from prison wages." (*Id.* at 12.)

According to Warden Fikes, the BOP's IFRP is a "completely voluntary program designed to help instill pro-social behavior skills to the inmate population," assists inmates in developing a financial plan to fulfil their financial obligations, and considers the inmate's efforts in fulfilling the obligations at subsequent program reviews, which indicates the inmate's "acceptance and demonstrated level of responsibility." (*Id.* at 5-7 (citing Dkt. 35-8, Ex. H (August 15, 2015 BOP IFRP Program Statement)).) An inmate's financial obligations are prioritized in the following order: (1) special assessments imposed under 18 U.S.C § 3013, (2) court-ordered restitution, (3) fines and court costs, (4) state and local court obligations, and (5) other federal government obligations. (*Id.* at 5-6 (citing Dkt. 35 ¶ 30 (Decl. of Derrick Lee-Lo); Dkt. 35-8, Ex. H at 4-6)).) IFRP payments may be made in two ways, that is, from: (1) institution resources (i.e., inmate

performance pay), or (2) non-institution (community) resources, and the inmate's IFRP

payments are calculated by the inmate's Unit Team by first subtracting the inmate's

minimum payment schedule for UNICOR[7] or non-UNICOR work assignments, and then

excluding $75.00 a month for telephone communication from its assessment.  (*Id.* at 6.)

> Staff therefore use the following calculation to determine an inmate's IFRP
> payment: (1) determine the total funds deposited into the inmate's trust fund
> account for the previous six months; (2) subtract the IFRP payments made
> by the inmate during the previous six months; and (3) subtract $450.00 (i.e.,
> $75.00 x 6 months, ITS exclusion).  Staff are advised that "[a]ny money
> remaining after the above computation may be considered for IFRP
> payments, regardless of whether the money is in the inmate's trust fund or
> phone credit account," and Unit Team has the "discretion to consider all
> monies above that computation to adjust the inmate's IFRP payment plan."
> Ultimately, the Unit Manager is the determining authority when it comes to
> deciding whether an inmate's IFRP payments are commensurate with his
> ability to pay, and this discretionary decision is to be decided on a case-by-
> case basis.

*Id.* at 5-6 (citing Dkt. 35 ¶ 32 (Decl. of Derrick Lee-Lo); Dkt. 35-8, Ex. H at 7).)

Warden Fikes asserts that Taylor has made 43 payments of $25 under the IFRP,

has completely paid off his $100-special assessment, and owes $15,589,502.81 in

restitution.  (*Id.* at 8 (citing Dkt. 35 ¶ 33 (Decl. of Derrick Lee-Lo); Dkt. 35-9, Ex. I

(Taylor's IFRP Payment History); Dkt. 35-10, Ex. J at 2 (Taylor's IFRP contract dated

January 7, 2021).)  Warden Fikes contends that on January 7, 2021, Taylor signed and

agreed to a new financial plan under the IFRP, obligating him to pay $55 per month

---

[7]    "The minimum payment for non-UNICOR and UNICOR grade 5 inmates is
$25.00 per quarter, but this minimum payment may be increased, taking into
consideration the inmate's specific obligations, institution resources, and community
resources."  (Dkt. 34 at 6.)

towards his financial obligations.  (*Id.* (citing Dkt. 35-10, Ex. J at 1).)  As a result, Warden Fikes asserts that Taylor's "payment amount is actually $55.00 per month"; that the BOP did not require Taylor to pay $100 per month in the IFRP; that Taylor's admission that he withdrew from the program instead of paying a higher amount depicts the voluntary nature of the program; and that such a voluntary program does not constitute an unlawful execution of Taylor's sentence.  (*Id.*at 13.)  Warden Fikes further argues that because Taylor "does not have a constitutional right to avoid the consequences for refusing to participate in the IFRP," his due process rights are not deprived, and even if otherwise, "due process was provided because Taylor acknowledge[d] on his IFRP contract that he was advised of the consequences of a refusal to participate in the program."[8]  (*Id.* at 13-14.)

In his Reply, Taylor points the Court to the Ninth Circuit case, *Ward v. Chavez*, 678 F.3d 1042 (9th Cir. 2012), for the proposition that the Restitution Order is invalid and that the BOP should stop collection of his restitution payments through the IFRP. (Dkt. 40 at 4.)  Taylor argues that his "IFRP should be suspended until the restitution order is corrected by the sentencing court."  (*Id.*)

---

[8]    An inmate that properly participates in the IFRP is placed on "Participates" status, those that are unable to participate in the program due to medical or psychological restrictions are placed in "Exempt TMP" status indicating his/her temporary exempt status, and an inmate that refuses to participate in the program or fails to make full payments under his/her established financial plan is placed in "Refuse" status.  (Dkt. 34 at 7.)

Taylor asserts that he "continues to be assigned to the Education Department work detail, and as confirmed by the Government [is] paying restitution to the IFRP through those wages." (Dkt. 43 ¶ 7.)

## II.    ANALYSIS

### A.    Jurisdiction

Given Taylor's transfer from FCI-Sandstone to FCI-Oxford during the pendency of this case (*see* Dkt. 42), the Court first addresses whether it has jurisdiction over Taylor's Petition, *see Lopez v. Fisher*, Civ. No. 10-2407 (PJS/TNL), 2012 WL 6778518, at *3-5 (D. Minn. Nov. 29, 2012). FCI-Oxford is a federal prison that is located in Oxford, Wisconsin, which is outside this Court's jurisdiction, and therefore Taylor is no longer in Warden Fikes' custody. However, as stated above, at the time Taylor initiated this matter, he was incarcerated at FCI-Sandstone and properly filed the Petition in this Court against his immediate custodian, Warden Fikes. (*See* Dkt. 1.) Accordingly, his subsequent transfer to FCI-Oxford by the BOP does not destroy this Court's jurisdiction over the Petition. *See Lopez*, 2012 WL 6778518, at *3-5 (discussing interplay between *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), and *Ex parte Endo*, 323 U.S. 283 (1944), and finding the court had jurisdiction over a habeas petition where the petition was filed when the petitioner was confined in FCI-Sandstone, properly named his immediate custodian, and was transferred to a different federal prison outside the court's jurisdiction by the BOP during the pendency of the case because *Padilla* did not alter *Endo*'s "important but limited proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains

jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release"), *R. & R. adopted*, 2013 WL 74363 (D. Minn. Jan. 17, 2013); *see also Mehighlovesky v. U.S. Dept. of Homeland Sec.*, Civ. No. 12-902 (RHK/JJG), 2012 WL 6878901, at *1 n.2 (D. Minn. Dec. 7, 2012) ("Although Petitioner is no longer incarcerated in the District of Minnesota, his current habeas corpus petition can still be properly adjudicated here, because he was confined in this District when the petition was filed.") *R. & R. adopted*, 2013 WL 187553 (D. Minn. Jan. 17, 2013); *Wright v. Lacy*, 664 F. Supp 1270, 1271 n.1 (D. Minn. 1987) ("It is well established that jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change.") (citations omitted).

## B.    Ground 1

As stated above, Taylor's remaining Ground 1 claims are that the BOP's failure to properly calculate and apply his GCT and FSA Credits affects his custody classification, prison security level, and his eligibility for CARES Act home confinement.  (Dkt. 2 at 3; Dkt. 13 at 15.)

The Court addresses each issue below.

### 1.    Taylor's GCT Claim is Moot

"Article III of the United States Constitution only allows federal courts to adjudicate actual, ongoing cases or controversies.  The case-or-controversy requirement exists at all stages of federal judicial proceedings."  *Parish v. Marques*, Case No. 19-cv-1038 (NEB/TNL), 2019 WL 5654047, at *2 (D. Minn. Sept. 13, 2019) (quoting *Potter v.*

*Norwest Mortg., Inc.*, 329 F.3d 608, 611 (8th Cir. 2003)) (citing U.S. Const. art. III, § 2)). "It is of no consequence that a claim was live at an earlier stage in the proceedings; a claim must be live when the court decides the issue. The 'case or controversy' requirement is not met if 'the question sought to be adjudicated has been mooted by subsequent developments.'" *Id.* (citations and quotations omitted).

"When, during the course of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief,' the case is considered moot." *Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005) (quoting *Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000)). When a case becomes moot, a federal court cannot "address the merits because any opinion [the court] would issue would be merely advisory." *In re Search Warrants Issued in Connection with Investigation of S. Cent. Career Ctr., W. Plains, Mo.* ("*In re Search Warrants*"), 487 F.3d 1190, 1192 (8th Cir. 2007) (citing *Haden*, 212 F.3d at 469).

In his Reply, Taylor "concedes that his GCT was updated" and "properly corrected." (Dkt. 40 at 2 (capitalization amended).) The Court understands this to mean that Taylor's GCT has now been properly calculated, awarded, and reflected in his sentencing time. Accordingly, Taylor's Petition is moot to the extent it alleges that the BOP miscalculated or misapplied his GCT or that the BOP's application of his GCT affects his custody classification, eligibility for CARES Act home confinement, and prison security level.

However, a court should not dismiss a habeas claim as moot if any of the following exceptions apply:

(1) secondary or 'collateral' injuries survive after resolution of the primary injury; (2) the issue is deemed a wrong capable of repetition yet evading review; (3) the defendant voluntarily ceases an allegedly illegal practice but is free to resume it at any time; or (4) it is a properly certified class action suit.

*Ahmed v. Sessions*, Case No. 16-CV-02124 (DSD/HB), 2017 WL 3267738, at *2 (D.

Minn. July 11, 2017) (quoting *Riley v. I.N.S.*, 310 F.3d 1253, 1257 (10th Cir. 2002)),

*R.&R. adopted*, 2017 WL 3268176 (D. Minn. July 31, 2017).

None of those mootness exceptions apply here, nor does Taylor argue to the contrary. Taylor has not identified any cognizable collateral consequences arising from his allegation that his GCT was not updated as quickly as he thought it should have been and does not complain that the updated GCT still has an effect on his custody classification, prison security level, or eligibility for CARES Act home confinement. (*See generally*, Dkts. 40, 43, 58.) Accordingly, the first exception to the mootness doctrine is inapplicable.

As to "a wrong capable of repetition yet evading review," that "exception applies if the matter is too short in duration to be fully litigated before it ends or expires and there is a reasonable expectation that [Petitioner] will be subjected to the same action again." *In re Search Warrants*, 487 F.3d at 1193. The record shows Taylor's GCT was credited on April 17, 2020. (*See* Dkt. 36 ¶ 6; *see also* Dkt. 36-4, Ex. D at 1-2 (Sentence Monitoring Computation Data for Taylor as of January 28, 2021).) Accordingly, it appears there is nothing further to litigate. *Ahmed*, 2017 WL 3267738, at *3 ("Because there is nothing further to litigate in Petitioner's case, [this] situation does not apply."). In any event, Taylor would have the ability to bring a new habeas petition in the

appropriate jurisdiction under a new set of facts and circumstances should he believe a re-calculation or re-application of his GCT is required. Therefore, the second exception to the mootness doctrine does not apply here.

With respect to the third exception, the exhibits submitted by Warden Fikes show Taylor's GCT was calculated and applied on April 17, 2020 (Dkt. 36 ¶ 6 (Decl. of Dawn Giddings); Dkt. 36-4, Ex. D at 1-2), before Taylor filed his Petition on May 26, 2020 (Dkt. 1), and there is nothing on the record to suggest that Respondent "voluntarily cease[d] an allegedly illegal practice" that it will resume "at any time." The Court also notes that Respondent previously reduced Taylor's sentence per the Sentence Reduction Order without the Court's intervention. (*See* Dkt. 36 ¶ 5 (Decl. of Dawn Giddings); *see also* Dkt. 36-3, Ex. C at 2 (Sentence Monitoring Computation Data for Taylor as of August 31, 2016).) Thus, based on the record before the Court, the voluntary-cessation exception to the mootness doctrine does not apply here.

Finally, the Petition was brought on behalf of an individual Petitioner, not on behalf of a class of individuals, so the fourth exception also does not apply here. (*See* Dkt. 1.) Accordingly, the Court recommends dismissal of Ground 1 as moot to the extent it alleges that the BOP miscalculated or misapplied Taylor's GCT or that the BOP's calculation or application of his GCT has an effect on his custody classification, prison security level, or eligibility for CARES Act home confinement.

2.      **Whether the BOP Properly Calculated Taylor's FSA Credits and Whether His FSA Credits Should Be Applied at This Time**

The Court turns to Taylor's arguments relating to his FSA Credits. First, the Court provides an overview of the applicable law, and second, applies that law to Taylor's claim.

a.      **FSA Requirements**

The FSA was signed into law on December 21, 2018, and provides, among other things that "[n]ot later than 210 days after the date of enactment of this subchapter, the Attorney General . . . shall develop and release publicly on the Department of Justice website a risk and needs assessment system" to be used to "determine the recidivism risk of each prisoner . . . and classify each prisoner as having minimum, low, medium, or high risk for recidivism." 18 U.S.C. § 3632(a)(1). On July 19, 2019, the Attorney General publicly released a risk and needs assessment system, stating the development of the Prisoner Assessment Tool Targeting Estimated Risks and Needs, also known as the "PATTERN," which was updated in January 2020. *See The First Step Act of 2018: Risk and Needs Assessment System*, U.S. Dep't of Justice Office of the Attorney Gen. (July 19, 2019), www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf; *see also The First Step Act of 2018: Risk and Needs Assessment System - UPDATE*, U.S. Dep't of Justice Office of the Attorney Gen. (January 2020), www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.

24

According to the FSA, the BOP then had 180 days from July 19, 2019 to "implement and complete" the PATTERN assessment for each prisoner. *See* 18 U.S.C. § 3621 (h)(1)(A); *see also Manning v. Kallis*, No. 21-cv-160 (JRT/KMM), 2021 WL 4526653, at *1 (D. Minn. Sept. 9, 2021) ("The First Step Act next establishes January 15, 2020 as the deadline for the BOP to implement and complete the initial PATTERN assessment for each prisoner") (citing 18 U.S.C. § 3621(h)(1)). The BOP was to provide opportunities for prisoners to participate in evidence-based recidivism reduction ("EBRR")[9] programs and productive activities ("PA")[10] and "provide incentives and rewards for prisoners" who complete those programs and activities, including "increased phone privileges, additional visitation time, transfer to prisons closer to prisoners' residence upon release, and, for prisoners who complete EB[R]R programs, 'time credits.'" *Manning*, 2021 WL 4526653, at *1 (citing 18 U.S.C. §§ 3632(d)(1), (d)(2), (d)(4)).

The BOP then had two years from the January 15, 2020 date, or until January 15, 2022, to "phase in" the EBRR programs and PAs for each prisoner. 18 U.S.C. § 3621(h)(2)(A); *see also Depoister v. Birkholz*, No. 21-cv-684 (ECT/BRT), 2021 WL

---

[9]     "An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison." 28 C.F.R. § 523.41(a).

[10]    "A PA is a group or individual activity that allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating." 28 C.F.R. § 523.41(b).

3492295, at *2 (D. Minn. Aug. 9, 2021).  During the 2-year phase-in period, the BOP's

"priority for such programs and activities shall be accorded based on a prisoner's

proximity to release date" and the BOP may begin to expand any EBRR programs and

PAs that exist at a prison and "may offer to prisoners who successfully participate in such

programs and activities the incentives and rewards described in subchapter D." 18 U.S.C.

§§ 3621(h)(3), (h)(4).

An eligible inmate "may" earn FSA Credits "for programming and activities in

which he or she participated from December 21, 2018, until January 14, 2020."  28

C.F.R. § 523.42(b)(2).  According to the BOP:

> [F]or inmate participation in programming during this period of time, the
> Bureau will exercise its discretion to award FSA Time Credits to inmates
> otherwise deemed eligible under the First Step Act by applying the same
> criteria as that applied to inmate participation in authorized EBRR programs
> or PAs recommended based on a risk and needs assessment after January
> 2020 to determine the inmate's retroactive Time Credit balance.  Eligible
> inmates will be afforded a presumption of participation for the period
> between December 21, 2018, and January 14, 2020 and be awarded Time
> Credits accordingly.

See *FSA Time Credits A Rule by the Prisons Bureau on 01/19/2022*, Federal Register,

The Daily Journal of the United States Government,

https://www.federalregister.gov/documents/2022/01/19/2022-00918/fsa-time-credits (last

visited December 2, 2022).

Eligible prisoners that "successfully complete[] evidence-based recidivism

reduction programming or productive activities" "shall earn 10 days of time credits for

every 30 days of successful participation" in such programs or activities, and a prisoner

that is determined by the BOP to be "at a minimum or low risk for recidivating, who,

over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation . . ."  18 U.S.C § 3632 (d)(4)(A)(i)(ii).  "'Successful participation' requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA."  28 C.F.R. § 523.41(c)(2).  An eligible inmate is generally not considered to be "successfully participating" in EBRR programs or PAs in situations including, but not limited to the following:

> (i) Placement in a Special Housing Unit;
>
> (ii) Designation status outside the institution (e.g., for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);
>
> (iii) Temporary transfer to the custody of another Federal or non–Federal government agency (e.g., on state or Federal writ, transfer to state custody for service of sentence, etc.);
>
> (iv) Placement in mental health/psychiatric holds; or
>
> (v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment)."

28 C.F.R. § 523.41(c)(4)(i)-(iv).

However, "[t]emporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's 'successful participation' for the purposes of FSA Time Credit eligibility."  28 C.F.R. § 523.41(c)(3).  FSA Credits for inmates that

successfully participate in EBRR programs or PAs "shall be applied toward time in

prerelease custody or supervised release."  18 U.S.C. § 3632(d)(4)(C).  Prelease custody

includes being placed in either home confinement or a residential reentry center.  18

U.S.C. § 3624(g)(2)(A)(B).  An inmate may lose FSA Credits "for violation of the

requirements or rules of an EBRR Program or PA" and the inmate may appeal that loss

"through the Bureau's Administrative Remedy Program." 28 C.F.R. § 523.43(a)(b).

Lost FSA Credits may be restored "on a case-by-case basis, after clear conduct (behavior

clear of inmate disciplinary infractions under 28 CFR part 541) for two-consecutive risk

and needs assessments conducted by the Bureau." 28 C.F.R. § 523.43(c).

An inmate that is eligible to apply his FSA Credits is someone who:

(A) has earned time credits under the risk and needs assessment system developed under subchapter D (referred to in this subsection as the "System") in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment;

(B) has shown through the periodic risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;

(C) has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law; and

(D) (i) in the case of a prisoner being placed in prerelease custody, the prisoner—

(I) has been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner; or

(II) has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison, after the warden's determination that--

> (aa) the prisoner would not be a danger to society if transferred to prerelease custody or supervised release;
>
> (bb) the prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and
>
> (cc) the prisoner is unlikely to recidivate; or

(ii) in the case of a prisoner being placed in supervised release, the prisoner has been determined under the System to be a minimum or low risk to recidivate pursuant to the last reassessment of the prisoner.

18 U.S.C.A. § 3624(g)(1).

As to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), that Act provides in response to the COVID-19 pandemic that:

> [I]f the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the [BOP] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.

Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (2020).

On March 26, 2020 and April 3, 2020, then-Attorney General William Barr issued a memorandum to ensure that the BOP "utilize[s] home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in [BOP] custody" and exercised his emergency authority under Section 12003(b)(2) to expand the cohort of inmates who may be considered for home confinement in light of the COVID-19 pandemic and its effect on prison populations.  *See Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic*, Office of the Attorney Gen. (March

26, 2020), https://www.bop.gov/resources/news/pdfs/ 20200405_covid-19_home_confinement.pdf; *see also Increasing Use of Home Confinement at Institutions Most Affected by COVID-19*, Office of the Attorney Gen. (April 3, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.  As a result, on May 8, 2020, the BOP began prioritizing the following inmates for home confinement: (1) inmates that have either "served 50% or more of their sentence," or (2) inmates that "have 18 months or less remaining on their sentence and have served 25% or more of their sentence."  (Dkt. 35-4, Ex. D at 1-2 (BOP May 8, 2020 Home Confinement Memorandum); *see also* Dkt. 35 ¶ 17 (Decl. of Derrick Lee-Lo).)

> ### b.    The Parties' FSA Arguments

Taylor asserts that he completed certain programs that made him eligible for FSA credits, but that the credits were not applied to his sentence.  (Dkt. 2 at 3 ¶¶ 3, 6.) Relying on the *O'Bryan* and *Goodman* cases, Taylor argued in his February 22, 2021 Reply that the BOP should immediately apply his FSA credits, which would make him eligible for home confinement or temporary furlough release "during the COVID-19 emergency status of the BOP."  (Dkt. 40 at 2-3.)  Warden Fikes states in the Update that as of February 26, 2022, the BOP calculated Taylor's FSA Credits at 450 days and that Taylor was "taken out of [time credit] earning status" on three occasions, from: (1) May 10, 2019 to May 22, 2019, while he was being transferred between BOP institutions (12 days); (2) December 5, 2019 to July 14, 2020, when he was in refuse status for the IFRP (222 days); and (3) September 20, 2021 to September 23, 2021, when he was housed at

an outside hospital (3 days), for a total of approximately 237 days.  (Dkt. 51 at 6; Dkt. 52 ¶ 11 (Decl. of Leann Reynolds).)

Respondent argues that Ground 1 should be dismissed as partially moot "because the calculation has now been completed, and if it were to affect anything else, the calculation is available."  (Dkt. 51 at 1, 6; *see also* Dkt. 52 ¶¶ 9, 11.)  Respondent also argues that Ground 1 should also be dismissed as partially premature and unripe because, pursuant to the FSA, Taylor is not entitled to have his FSA Credits applied to his sentence because they do not equal the remainder of his sentence given that he is not scheduled for release from BOP custody until January 16, 2031.  (Dkt. 51 at 1, 7.)

Taylor acknowledges in his Response to Update that his FSA Credits have been calculated at 450 days, but argues that this aspect of Ground 1 is not moot because the BOP improperly failed to award him credits: (1) due to his institution to institution transfer from May 10, 2019 to May 22, 2019, (2) while he was on IFRP refusal status between December 5, 2019 and July 14, 2020, and (3) while he was hospitalized due to COVID-19 complications from September 20, 2021 to September 23, 2021.  (Dkt. 58 at 1.)  In other words, Taylor believes he is entitled to more than 450 days of FSA Credits, although it is unclear how many more days.  He also argues that the BOP's failure to award him his FSA Credits affects his "CARES ACT Eligibility calculation for consideration of early release."  (*Id.* at 1.)  Taylor maintains that he has a liberty interest in having his sentence properly calculated and reduced by 12 months under the FSA due to his earned time credits, and applying those FSA Credits would place him well over the

50% threshold for consideration for CARES Act home confinement, given that he has served over 86 months of his sentence. (*Id.* at 1-2.)

The Court first considers Respondent's mootness argument. The Court has some concern with Respondent's argument that Taylor's FSA Credits claim is partially moot "because the calculation [of 450 days of FSA Credits] has been completed, and if it were to affect anything else, the calculation is available." (Dkt. 51 at 1.) Plainly, Taylor believes the calculation is incorrect and he is entitled to more than 450 days of FSA Credits. However, Taylor has not explained how the difference between 450 days and the number of days he believes he is entitled to would affect his custody classification and prison security level, and Taylor has now been assigned a minimum-risk recidivism level and transferred to a minimum security prison camp. (Dkt. 42; *see also* Dkt. 43 ¶¶ 9-10; Dkt. 51 at 5; Dkt. 52 ¶ 5 (Decl. of Leann Reynolds); Dkt. 52-2, Ex. B at 1 (Minimum risk recidivism level as of April 28, 2021).) The Court therefore recommends a finding that Taylor's claims are moot to the extent he seeks relief regarding his custody classification and prison security level.[11] *See Ali*, 419 F.3d at 723 ("When, during the course of litigation, the issues presented in a case 'lose their life because of the passage of

---

[11]    None of the mootness exceptions apply here as Taylor has not identified any cognizable collateral consequences arising from his allegation that his FSA Credits were not updated as quickly as he thought it should have been given the provisions of the FSA, including that he was not entitled to earn time credits during the periods at issue; there is no "wrong capable of repetition yet evading review" because there is nothing further to litigate as to the BOP's calculation of Taylor's FSA Credits; there is nothing on the record to suggest that Respondent "voluntarily cease[d] an allegedly illegal practice" that it will resume "at any time"; and the Petition was brought on behalf of an individual Petitioner, not on behalf of a class of individuals.

time or a change in circumstances . . . and a federal court can no longer grant effective relief,' the case is considered moot.") (citations omitted).

The Court next considers Taylor's argument that his FSA Credits, if properly calculated and applied, would render him eligible for CARES Act home confinement and an earlier release date.  Taylor argues that the FSA Credits he has accrued should be applied immediately to reduce his sentence and thereby increase the percentage of time he has served so that he may be eligible for home confinement or temporary furlough "during the COVID-19 emergency status of the BOP."  (Dkt. 40 at 2-3; *see also* Dkt. 58 at 1.)  Taylor contends that he has a liberty interest in having his sentenced reduced by 12 months under the FSA, and if reduced, given that he has served over 86 months of his sentence, would place him "well over the 50% threshold for being considered for CARES Act home confinement."  (Dkt. 58 at 1-2.)

Warden Fikes maintains that Ground 1 is not ripe because Taylor is not entitled to have his FSA Credits applied to his sentence given that his accrued time credits of 450 days do not equal the remainder of his sentence.  (Dkt. 51 at 1, 7-8.)  He further argues that Taylor's Minimum PATTERN score could increase and Taylor could also be subjected to disciplinary action before his FSA Credits equal the remainder of his sentence, which could impact his ability to apply the earned credits to his sentence.  (*Id.* at 7-8.)  Finally, Respondent contends that an inmate's FSA Credits are not considered part of the time served component for purposes of CARES Act home confinement.  (Dkt. 51 at 8.)

"A court lacks subject matter jurisdiction over an action if the action is not ripe for resolution." *ASEA/AFSCME Local 52 Health Benefits Trust v. St. Jude Medical, LLC*, 362 F.Supp. 3d 642, 647 (D. Minn. 2019) (citing *Dakota, Minn. & E. R.R. Corp. v. S.D.*, 362 F.3d 512, 520 (8th Cir. 2004). "The doctrine of ripeness is basically a matter of timing, which requires (1) a sufficiently concrete case or controversy within the meaning of Article III of the Constitution, and also (2) prudential considerations must justify the present exercise of judicial power." *Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1050 (8th Cir. 1996) (internal quotation marks and citation omitted). "Merely potential impairment of constitutional rights under a statute does not of itself create a justiciable controversy in which the nature and extent of those rights may be litigated." *Alexander v. Thornburgh*, 713 F. Supp. 1278, 1286 (D. Minn. 1989) (quoting *Communist Party v. Subversive Activities Control Bd.,* 367 U.S. 1, 71 (1961)). "To be ripe for decision, the harm asserted must have matured sufficiently to warrant judicial intervention." *National Bank v. First Premier Capital LLC*, Civ. No. 10-903 ADM/JJK, 2010 WL 11646824, at *2 (D. Minn. July 22, 2010) (citation omitted).

The FSA is clear that a prisoner is only eligible to apply FSA Credits when the prisoner "has earned time credits under the risk and needs assessment system . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." 18 U.S.C. 3624(g)(1)(A); *see also Lallave v. Martinez*, 22-CV-791 (NGG) (RLM), 2022 WL 2338896, *11 (E.D.N.Y. June 29, 2022) ("[T]he BOP is permitted to apply time credits only once an inmate 'has earned time credits that equal the remainder of [her] sentence.'. . . This is because time credits may be lost. Thus, since Petitioner's FSA

credits do not equal the remainder of her sentence, it would be inappropriate for the court to direct the BOP to adjudicate the credits at this time.") (citations omitted). That said, the Court has some concern to the extent Respondent suggests that Taylor's claim is not ripe because he has more days remaining on his sentence than the 450 days of FSA Credits calculated by the BOP. (*See* Dkt. 51 at 7.) Taylor's claim is premised, in part, on the argument that he is entitled to more than 450 days of FSA Credits. At some point, Taylor would reach the point where the number of days of FSA Credits he believes he is entitled to (rather than the number of FSA Credits the BOP has credited him with) would equal the remainder of his sentence. However, that time is not now, as Taylor's release date of January 16, 2031 is more than 2,950 days from the date of this Report and Recommendation, and Taylor has identified approximately 237 days for which he was taken out of time credit earning status, for which he believes he should be awarded an unspecified number of FSA Credits. The Court therefore recommends denial of Taylor's Petition as not ripe to the extent it seeks application of his FSA Credits at this time or credit for the three disputed time periods at issue.[12]

The Court has considered carefully Taylor's argument that his FSA Credits, if applied now, would render him eligible for CARES Act home confinement. Respondent states that FSA Credits are not considered part of the time served component of an inmate's sentence for purposes of CARES Act home confinement. (Dkt. 51 at 8.)

---

[12] The Court notes, however, that Respondent provided no explanation of how any of the three time periods fall within the scope of 28 C.F.R. § 523.41(c)(4)(i)-(iv), and therefore mean he was not "successfully participating" in EBRR programs or PAs, and the BOP's rationale for doing so is not readily apparent to the Court.

Neither party provided any authority on this point, and in view of the clear language of

the FSA stating that FSA Credits are applied only when they equal the remainder of the

inmate's sentence, the Court does not delve into this issue further.  *See Milchin v.*

*Warden*, Case No. 3:22-cv-195 (KAD), 2022 WL 1658836, at *3 (D. Conn. May 25,

2022) ("Milchin contends that all time credits can be applied to his sentence and will

move up his release date.  He argues that, under this construction, he will have served

50% of his sentence and, therefore, be eligible for consideration for transfer to home

confinement. Time credits, however, may be lost.  For this reason, the statute provides

that a prisoner is eligible to have earned time credits applied for earlier release to

prerelease custody only when he has earned time credits that equal the remainder of his

sentence.  At that time, the credit can immediately be applied and would no longer be

subject to loss for future prohibited acts.  Until Milchin accumulates sufficient time

credits to equal the remainder of his sentence, he is not eligible to have those credits

applied.  Accordingly, this claim is without merit.") (footnote omitted) (citing 28 C.F.R.

§ 523.43; 28 C.F.R. § 541.3; 18 U.S.C § 3624(g)(1)(A)); *see also Mills v. Starr*, Civ. No.

21-1335 (SRN/BRT), 2022 WL 4084178, at *4 (D. Minn. Aug. 17, 2022) (finding the

petitioner's claim for immediate application of her FSA time credits lacked merit and

stating "Mills has 555 days of earned time credits. Mills also has a projected release date

of November 12, 2028, via a good conduct time release. This means that, as of this

Report and Recommendation, Mills has over six years remaining on her sentence. Thus,

even if she had earned twice as many earned time credits as the 555 days the BOP

calculates, she still would not have enough time credits that is equal to the remainder of

her imposed term of imprisonment. As such, Mills is ineligible to have her time credits applied.") (footnote omitted), *R. & R. adopted*, 2022 WL 4080750, at *1 (D. Minn. Sept. 6, 2022); *Adkins v. Engleman*, Case No. CV 22-1988 JLS (MRW), 2022 WL 14966123, at *2 (C.D. Cal. Sept. 8, 2022) ("Federal courts around the country read Section 3624(g)(1)(A) to mean that 'the BOP is permitted to apply time credits <u>only</u> once an inmate' has earned enough 'that equal the remainder of her sentence.'") (collecting cases), *R. &R. adopted*, 2022 WL 15116425, at *1 (C.D. Cal. Oct. 24, 2022).

    The Court also notes it has no authority to order that Taylor be placed in home confinement.  *See id.* at *2 ("Under the CARES Act . . . Congress expanded the authority of BOP to transfer inmates to home confinement if certain criteria are met.  Like a transfer to home release under section 3621(b), however, the decision to grant a transfer to home confinement under the CARES Act is reserved to the discretion of BOP."); *see also United States v. Houck*, 2 F.4th 1082, 1085 (8th Cir. 2021) (discussing home confinement as a place of imprisonment and noting that "the district court correctly held that it did not have authority to change [the defendant's] place of imprisonment to home confinement") (citing 18 U.S.C. § 3624(c)(2) and *United States v. Hester*, No. 2:06-cr-193-ECM, 2020 WL 5535010, at *1 n.1 (M.D. Ala. Sept. 15, 2020) ("While section 12003(b)(2) of the CARES Act allows the BOP to extend the amount of time prisoners may serve in home confinement, it does not extend the District Court the authority to make such an order.")); *Hogate v. Starr*, Case No. 20-cv-1295 (PAM/TNL), 2021 WL 3476714, at *9 (D. Minn. July 2, 2021) ("Courts cannot review the BOP's administrative decision to deny Petitioner's request for transfer to home confinement, as 18 U.S.C. §

3625 precludes judicial review of agency adjudicative decisions.") (citations and quotations omitted); *United States v. Vang*, Crim. No. 16-277 (DWF/KMM), 2020 WL 4704875, at *2 (D. Minn. Aug. 13, 2020) ("[T]he BOP has exclusive authority to determine the placement of prisoners.  Neither the CARES Act nor the FSA alters this authority.") (collecting cases); *United States v. Kluge*, Crim. No. 17-61 (DWF), 2020 WL 209287, at *3 (D. Minn. Jan. 14, 2020) ("Nothing in the statutes amended by the FSA permits the Court to place Defendant in home confinement.  Under the FSA, the authority to place a prisoner remains with the BOP.").

For all of these reasons, the Court recommends dismissal of Ground 1 to the extent it seeks correction of Taylor's FSA Credits at this time or seeks application of his FSA Credits for purposes of the FSA or CARES Act home confinement eligibility.

## C.    **Ground 3**

In Ground 3, Taylor asserts that: (1) the Restitution Order is "unlawful as it did not specify a payment schedule" and because it states "[r]estitution is due and payable immediately" (Dkt. 2 ¶¶ 34-35, 38, 40); (2) the BOP is improperly handling his restitution payments through the IFRP and is "failing to follow the U.S. District Court's order that restitution be only taken from [Taylor's] 'prison wages.'"  (*Id.* ¶¶ 33, 37; Dkt. 1 at 11); and (3) urges this Court to order "the BOP . . . to not include restitution in its [calculations] until the sentencing court corrects its judgment."  (*Id.* ¶ 39).

Respondent contends that this Court has jurisdiction "to address Taylor's IFRP payments under 28 U.S.C. § 2241" and argues that the Restitution Order is valid as it articulated a schedule for Taylor's restitution payments and that the BOP is properly

38

deducting Taylor's restitution payments from his IFRP funds.  (Dkt. 34 at 1, 11-13 & n.6.)  The Court addresses each argument in turn.

### 1.    Validity of the Restitution Order

Through the supporting memorandum for his § 2241 Petition, Taylor claims that the Restitution Order is "unlawful as it did not specify a payment schedule" and because it states "[r]estitution is due and payable immediately."  (Dkt. 2 ¶ 38; Dkt. 1.)  In support of this argument, Taylor cites *United States v. McGlothlin*, in which the Eighth Circuit found the district court impermissibly delegated a defendant's payment schedule during incarceration to the BOP.  249 F.3d 783, 785 (8th Cir. 2001) ("We have previously upheld the calculating of a defendant's ability to pay a statutorily imposed obligation based on the defendant's likely prison earnings through the IFRP.  That being said, the MVRA provides that the manner of payments and 'the length of time over which scheduled payments will be made shall be set by the court.'  We interpret this statement to require the district court to set a detailed payment schedule at sentencing.") (cleaned up) (citations omitted).[13]

Warden Fikes responds that "*McGlothlin* is not the Eighth Circuit's final word on this issue[,]" and cites *United States v. Vanhorn*, 344 F.3d 729, 930 (8th Cir. 2003), as that final word.  (Dkt. 34 at 11-12.)  In *Vanhorn*, the district court ordered that "proceeds in an existing account be paid immediately to the victim" and that the remaining restitution "will be paid by defendant on an installment basis in the way the Bureau of

---

[13]    Taylor also cites *Ward v. Chavez*, 678 F.3d 1042 (9th Cir. 2012), which has a similar holding but is a Ninth Circuit decision and therefore not binding on this Court.

Prisons handles this through its Inmate Financial Responsibility Program at the rate of no less than 50% of the funds available to defendant during incarceration."  344 F.3d at 730-31.

Under the Mandatory Victim Restitution Act of 1996, the sentencing court is required, "pursuant to section 3572, [to] specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid."  18 U.S.C. § 3664(f)(2).

Here, the Restitution Order at issue ordered Taylor to pay a $100 special assessment, "due immediately," and over $15 million in restitution.  (*Taylor* Dkt. 65 at 1, 6.)  The Restitution Order states:

> Restitution is due and payable immediately. The defendant shall make restitution payments from any wages he may earn in prison in accordance with the Bureau of Prisons Financial Responsibility Program. If restitution is not paid in full at the time of [Taylor's] release, payment shall become a condition of supervised release to be paid at a monthly rate of at least $150.00, plus 25% of gross income in excess of $2,300.00 per month.

(*Id.* at 2.)  During sentencing, the district court stated: "Restitution is required to be paid in full immediately."  (*Taylor* Dkt. 68 at 65:16-17.)

The Court must first determine whether Taylor has properly brought his validity claim.  A petitioner seeking to challenge her court conviction or sentence must bring a motion under 28 U.S.C. § 2255 in the district of her sentencing.  *See, e.g.*, *Lopez-Lopez v. Sanders*, 590 F.3d 905, 907 (8th Cir. 2010) (citing *Abdullah v. Hedrick*, 392 F.3d 957, 959 (8th Cir. 2004)); *Sorensen v. Barnes*, Case No. 19-CV-2268 (JRT/ECW), 2019 WL 7650424, at *1 (D. Minn. Sept. 23, 2019) (quoting *Hill v. Morrison*, 349 F.3d 1089, 1091

(8th Cir. 2003)), *R.&R. adopted*, 2020 WL 375885 (D. Minn. Jan. 23, 2020). Whereas, a petitioner that challenges her sentence's execution, not its imposition, must do so under 28 U.S.C § 2241 in the district of her incarceration. *See, e.g.*, *Matheny*, 307 F.3d at 711 ("A petitioner may attack the execution of his sentence through § 2241 in the district where he is incarcerated; a challenge to the validity of the sentence itself must be brought under § 2255 in the district of the sentencing court.") (citations omitted); *United States v. Debruzzi*, Crim. No. 17-160 (DWF/KMM), 2019 WL 5422860, at *4 n.4 (D. Minn. Oct. 23, 2019) (citing authorities).

Under these general rules, a § 2241 action in this District is not the proper vehicle for Taylor to bring his validity challenge to the Restitution Order. *See Matheny*, 307 F.3d at 711 (affirming the district court's finding that the petitioner improperly brought a § 2241 action, instead of § a 2255 motion in the district where his sentence was imposed, because his claim that the sentencing court violated "Article III of the United States Constitution because the court . . . delegated its sentencing power to the BOP" by ordering that "restitution be paid immediately" "attack[ed] the validity of the sentence[.]"); *see also White v. Wilson*, Case No. 15-cv-3700 (WMW/HB), 2016 WL 11491378, at *2 (D. Minn. March 22, 2016) ("Here, White is challenging the validity of his sentence. Thus, he must bring his claims in a § 2255 motion filed in the district where he was sentenced[.]") (citation omitted).

These general rules have an important exception: a petitioner can use a § 2241 petition to bring his challenge if the § 2255 remedy "is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e); *see also White*, 2016 WL 11491378,

at * 2.  Courts commonly refer to this provision of § 2255(e) as the "savings

clause."  *See, e.g.*, *Lee v. Sanders*, 943 F.3d 1145, 1147 (8th Cir. 2019) (using term).

However, given the language of § 2255(e) that "[a]n application for writ of habeas

corpus [o]n behalf of a prisoner **who is authorized to apply for relief by motion**

**pursuant to this section**, shall not be entertained . . .[,]" the Court must first determine

whether a challenge to an order of restitution is cognizable under a § 2255 motion in this

Court, before then assessing the merits of Taylor's validity challenges to the Restitution

Order. *See* 28 U.S.C. § 2255(e) (emphasis added); *see also Estate of Farnam v. C.I.R.*,

583 F.3d 581, 584 (8th Cir. 2009) (stating that the first step in statutory analysis "'is to

determine whether the language at issue has a plain and unambiguous meaning with

regard to the particular dispute in the case.'  If so, the analysis ends and the court applies

the statute's plain meaning.  In determining whether statutory language is plain and

unambiguous, the court must read all parts of the statute together and give full effect to

each part.") (citations omitted); *Washington v. Garcia*, Civ. No. 10-cv-00089-ZLW, 2010

WL 1039208, at *1 (D. Col. March 17, 2010) ("The inadequacy of § 2255 only applies to

the extent that the 'prisoner . . . is authorized to apply for relief by motion pursuant to

§ 2255.") (quoting *Scatterfield v. Scibana*, 275 F. App'x 808, 809-10 (10th Cir. Okla.

Apr. 30, 2008) (unpublished) and citing 28 U.S.C. § 2255(e)).  Under § 2255,

> A prisoner in custody under sentence of a court established by Act of
> Congress claiming the right to be released upon the ground that the sentence
> was imposed in violation of the Constitution or laws of the United States, or
> that the court was without jurisdiction to impose such sentence, or that the
> sentence was in excess of the maximum authorized by law, or is otherwise
> subject to collateral attack, may move the court which imposed the sentence
> to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

In *Shepard v. United States*, the Eighth Circuit clarified its *Matheny* decision, stating that *Matheny* did not address "whether a challenge to the restitution portion of the sentence was cognizable under section 2255, but simply put forth a more general proposition that claims attacking the validity of a sentence should be raised under section 2255 in the sentencing court." 735 F.3d 797, (8th Cir. 2013). The Eighth Circuit noted that its prior decision in *United States v. Bernard*, 351 F.3d 360 (8th Cir. 2003), did not conflict with *Matheny* where the Circuit court held in *Bernard* that "a federal prisoner cannot challenge the restitution portion of his sentence under section 2255, because the statute affords relief only to prisoners claiming a right to be released from custody[,]" and made clear that a § 2255 motion is not a proper vehicle for a prisoner to challenge the restitution portion of his sentence. *Id.* The Eighth Circuit reiterated in *Dyab v. United States* that a motion under § 2255 is not the "correct vehicle" to challenge the restitution portion of a sentencing court's judgment because "a dispute about restitution does not involve a claim of a right to be released from custody, a prisoner cannot challenge the restitution portion of his sentence under § 2255." 855 F.3d 919, 922 (8th Cir. 2017) (affirming the dismissal of petitioner's due process claim "on the ground that it is not cognizable under § 2255.").

Because Taylor is foreclosed from seeking § 2255 relief with respect to his validity claim, the Court need not proceed further. *See Satterfield*, 275 F. App'x at 809 (recognizing that a prisoner's challenge to his restitution order cannot be brought under §

2241 or § 2255, stating a "§ 2241 motion cannot challenge [a petitioner's] restitution order any more than a § 2255 motion can."); *see also Kidd v. Lappin*, 30 F. App'x 614, 616 (7th Cir. 2002) (unpublished) ("In any event, an argument contesting the constitutional validity of a sentence must be brought in a motion under 28 U.S.C. § 2255, but a challenge to an order of restitution is not cognizable in a § 2255 motion[.]") (citations omitted); *United States v. Young*, 249 Fed.Appx. 793, 794 (11th Cir. 2007) (unpublished) ("We must resolve jurisdictional issues before we address the merits of the underlying claims."); *Chavarriaga v. Lanigan*, Civ. No. 12-7700 (MAS), 2017 WL 3079843, at *5 (D. N.J. July 19, 2017) (finding in the context of a § 2254 petition that "[t]he Court is in agreement with its sister courts in this district as well as other circuit courts around the country, and finds that restitution orders are not challengeable on a federal habeas petition, because they do not challenge a habeas petitioner's custody[.]); *Austin v. United States*, 2009 WL 377215, at *2 (M.D. Fla. Feb. 12, 2009) ("Because petitioner was not authorized to apply for relief from his restitution order under § 2255, he can not [sic] bring a motion as a § 2241 motion either.")

The Court recognizes Taylor's argument that he was unable to bring his validity challenge through a § 2255 motion in the Northern District of Georgia, where he was sentenced. However, based on the Court's analysis above, this does not alter the Court's findings. *See Washington v. Garcia*, 378 F. App'x 854, 855 (10th Cir. 2010) (unpublished) (affirming the denial of petitioner's § 2241 motion, assessing the petitioner's argument that the savings clause applies "because the Northern District of Illinois and the Seventh Circuit refused to hear his claims[,]" and finding that: "But a

§ 2255 motion is ineffective or inadequate 'only in extremely limited circumstances,' such as when the sentencing court has been abolished.  That a prisoner is procedurally barred from filing a § 2255 motion in the sentencing court does not establish that a § 2255 remedy is inadequate or ineffective.  The various bars on Mr. Washington's § 2255 motions thus do not entitle him to [the savings clause]".) (citations omitted); *see also Washington v. Garcia*, Civ. No. 10-cv-00089-ZLW, 2010 WL 1039208, at *1 (D. Col. Mar. 17, 2010) (dismissing the petitioner's argument that his § 2255 "remedy in the sentencing court is inadequate and ineffective because the sentencing court refuses to address the merits of his claims regarding the validity of his sentence" and finding that without "an authorization under § 2255 to apply for relief there is no basis for finding that the § 2255 remedy in the sentencing court is inadequate or ineffective").

For all these reasons, the Court recommends dismissal of Ground 3 as it relates to Taylor's challenge of the validity of the Restitution Order.

### 2.    Taylor's Participation in the IFRP and the BOP's Withdrawal of His Restitution Payments

The Court has jurisdiction to consider Taylor's challenge of his restitution payments through the IFRP.  *See Matheny*, 307 F.3d at 711-712 ("A petitioner may attack the execution of his sentence through § 2241 in the district where he is incarcerated . . . The remaining claims of the petitioners challenge the IFRP's payment schedule for their respective financial obligations. These claims concern the execution of sentence, and are therefore correctly framed as § 2241 claims brought in the district where the sentence is being carried out."); *Fontanez v. O'Brien*, 807 F.3d 84, 87 (4th Cir. 2015) (holding that

"an inmate's challenge to the BOP's administration of the IFRP is a challenge to the 'execution' of a sentence that is cognizable under 28 U.S.C § 2241.").

Taylor argues that the BOP does not have authority to collect his restitution payments through the IFRP and that the BOP is not complying with the Restitution Order which requires "restitution be only taken from [his] prison wages." (Dkt. 1 ¶ 13.) Taylor asserts that prior to May 2019, his IFRP payments "were based upon his prison wages and set at $25 per quarter." (*Id.*) In May 2019, however, after a transfer to FCI-Sandstone, "prison officials increased [Taylor's] amount to $100 per month," which was unaffordable to him and forced him to withdraw from the IFRP. (*Id.*) Respondent responds that Taylor has made 43 payments of $25 under the IFRP and that on January 7, 2021, Taylor signed and agreed to a new financial plan under the IFRP, agreeing to pay $55 per month towards his financial obligations, and as a result, Taylor's "payment amount is actually $55.00 per month." (Dkt. 34 at 8-9, 11-13.)

As stated above, Taylor contends that *Ward*, *supra*, provides support for his argument. In *Ward*, the Ninth Circuit was faced with the question of whether a district court impermissibly delegated its obligation to set a restitution payment schedule by ordering that restitution payments were due immediately "with the expectation that the [BOP would] work out a payment schedule with the prisoner pursuant to the [IFRP]." 678 F.3d at 1043-44. While the petitioner was incarcerated, portions of his "Unicor pay was deducted and applied to his restitution obligation," causing the petitioner to file various motions in the sentencing court requesting deferral and/or reduction of his restitution payments. *Id.* at 1044. The petitioner then filed a habeas petition claiming

that the restitution order was invalid and thus, the BOP could not force him to participate in the IFRP. *Id.* Ultimately, the *Ward* court agreed with the petitioner that the restitution order was invalid because it failed to set a "proper" payment schedule and found that where "the district court simply orders immediate repayment" and leaves it to "the BOP[] to actually set the payment schedule that the statute obligates the court to determine, that order is unlawful, as the district court has abdicated in its duty to set the schedule 'in consideration of' the financial circumstances of the defendant." *Id.* at 1048, 1050.

This Court has already concluded in Section II.C.1 that it lacks subject matter over the question of validity as to the Restitution Order. Moreover, the Ninth Circuit's decision in *Ward* is not controlling authority in this District, and the Eighth Circuit has addressed the BOP's discretion to place an inmate in the IFRP when the sentencing court ordered immediate payment of court-imposed fines in *Matheny*, *supra*. In *Matheny*, two inmates claimed that the BOP, through the IFRP, "illegally set the amount and timing of payments towards" their criminal financial obligations. 307 F.3d at 710. The first inmate was ordered to pay a fine of $15,000 "immediately" with any remaining balance to be paid "on a payment schedule of not less than $260 per month with the first payment due within 30 days of the defendant's release from custody." *Id.* at 711. Accordingly, the BOP deducted $25 per month from that inmate's prison earnings through the IFRP as payments towards his fine. *Id.* The second inmate was ordered to pay $287,000 in restitution by the sentencing court, to be paid "immediately, with special instructions that [petitioner] was required to make periodic payments against his restitution obligations equaling twenty percent of his gross pay during his supervised release." *Id.* The second

47

inmate was also placed in the IFRP program while incarcerated, through which the BOP withdrew $25 per month from his prison funds towards his restitution payments. *Id.* The Eighth Circuit consolidated the two inmates' appeals, stated that it was "evident that both appellants were instructed to begin to make payments immediately," and held that the "immediate payment directive is generally interpreted to require payment to the extent that the defendant can make it in good faith, beginning immediately." *Id.* at 712 (quotations and citations omitted). The Eighth Circuit held that as to the first inmate, the sentencing court contemplated that he might make payments during his period of incarceration by ordering him to pay his fine "in full immediately" and "to pay *any remaining fine balance* on a payment schedule of not less than $260 per month," and that the sentencing court similarly contemplated that the second inmate might make payments while incarcerated by ordering that the second's inmate's restitution "was due in full immediately, with the special instructions for any unpaid amount that remained during his period of supervised release." *Id.* Additionally, in *Vanhorn, supra,* the Eighth Circuit held that "[n]othing prohibits [a] district court from choosing a manner of payment that is based upon a policy already in use by the [BOP], as long as the district court articulates the schedule." 344 F.3d at 731.

Here, the Restitution Order states that "[r]estitution is due and payable immediately" and ordered Taylor to:

> make restitution payments from any wages he may earn in prison in accordance with the Bureau of Prisons Financial Responsibility Program. If restitution is not paid in full at the time of [Taylor's] release, payment shall

48

become a condition of supervised release to be paid at a monthly rate of at least $150.00, plus 25% of gross income in excess of $2,300.00 per month.

(*See Taylor* Dkt. 65 at 2.)

Beginning in September 2015, Taylor made restitution payments of $25 almost every month until January 2021 through the IFRP.[14]  (*See* Dkt. 35-9, Ex. I at 1-3 (BOP's Report of Taylor's IFRP Transactions).)  On January 7, 2021, Taylor signed an "Inmate Financial Plan," agreeing to pay $55 per month towards his restitution obligation through the IFRP, to begin in February 2021, and acknowledged that "a staff member ha[d] provided [him] with information regarding the potential consequences of a refusal on [his] part to participate in the [IFRP]."  (Dkt. 35-10, Ex. J at 1 (Taylor's Inmate Financial Plan Contract).) (capitalization amended).

Contrary to Taylor's assertions, the BOP has the authority to place him in the IFRP and the record does not show that the BOP is improperly deducting his restitution payments through the IFRP.  *See Hill v. Fikes*, No. 20-cv-1365 (SRN/LIB), 2021 WL 606709, *2-3 (D. Minn. Jan. 29, 2021) (finding that petitioner's monetary penalties were "due immediately" and that the BOP had authority to place the petitioner in the IFRP where the "sentencing court did not provide for payment on a certain date [or] specify an installment plan"); *see also Cervantes v. Cruz*, Civ. No. 07-4738 (DWF/JJK), 2009 WL

---

[14]    Based on the IFRP payment transaction report, it appears Taylor did not make any IFRP payments in the following months:  October 2015 through July 2016, June 2019 through August 2019, October and November of 2019, and January 2020 through July 2020.  (Dkt. 35-9, Ex. I at 1-3.)  The report shows Taylor last made an IFRP payment of $25 on January 7, 2021.  (*Id.* at 1.)

76685, *4 (D. Minn. Jan. 8, 2009) (finding that because the judgment and conviction order required the petitioner to pay his fine immediately through the IFRP, "the BOP has not usurped the district court's sentencing authority by utilizing the IFRP program in this case").  Neither does the Restitution Order require that Taylor's restitution payments be made only from Taylor's "prison wages" as he claims.  *(See Taylor* Dkt 65 at 2 (requiring that Taylor make payments from "**any wages** he may earn in prison.")) (emphasis added); *see also Hill*, 2021 WL 606709, at *4 (noting that the BOP's IFRP policy "expressly requires the BOP to consider the total funds deposited into [an inmate's] trust fund account when developing his IFRP financial plan").

Taylor claims that he was forced to withdraw from the IFRP due to the BOP requiring him to pay $100 per month beginning in May 2019.  However, the record before the Court does not show that Taylor has made any payments of $100 and Taylor has not provided any evidence to support this claim.  Moreover, the IFRP is a voluntary program which provides the unit team discretion to adjust an inmate's IFRP payment plan to commensurate with the inmate's ability to make payments based on the inmate's financial capabilities.  (*See* Dkt. 35-8, Ex. H at 7 (August 15, 2015 BOP IFRP Program Statement[15]).)  As Respondent stated, the voluntary nature of the IFRP is evident from the fact that Taylor was able to withdraw from the program.[16]

---

[15]    The Program policy states that the inmate's financial plan will be periodically reviewed, during which time staff would assess "whether the financial plan is being increased, decreased, or will continue at the same rate."  (Dkt. 35-8, Ex. H at 10.)

[16]    To the extent Taylor attempts to assert a due process claim regarding his withdrawal from and/or consequences derived from not partaking in the IFRP, it does not

In any event, Taylor has now been transferred to FCI-Oxford, so it is not clear whether his obligations under the IFRP while at FCI-Sandford still applies. (*See* Dkt. 42; Dkt. 35-10, Ex. J at 1) (Taylor's Inmate Financial Plan Contract wherein Taylor acknowledges that he "[U]nderstand[s] that the payment plan [of $55 per month] will automatically stop and no funds will be withdrawn from [Taylor's] account in the event that [he is] permanently released from [his] present institution of confinement.").) For all of these reasons, the Court recommends dismissal of Ground 3 as it relates to Taylor's claims that the BOP lacks authority to withdraw restitution payments from his IFRP financial plan or that the BOP is improperly withdrawing such amounts and is failing to comply with the Restitution Order.

### 3.    Preliminary Injunction

Lastly, Taylor asks the Court to order Respondent to stop collecting his restitution payments through the IFRP "until the sentencing court corrects its judgment." (Dkt. 2 ¶ 39.) The Court construes Taylor's request as a request for a preliminary injunction. *See, e.g., Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *W. Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, 870 F.3d 774, 785 (8th Cir. 2017) (citing *Camenisch*).

---

amount to constitutional violation. *See Cervantes*, 2009 WL 76685 at *5 (finding the petitioner did not have a viable due process claim due to potential consequences resulting from withdrawing from the IFRP as "[n]one of the consequences of an inmate's refusal to participate in the IFRP, such as the loss of benefits or privileges [afforded by participating in the program], give rise to a constitutional violation").

In view of the Court's recommendation for dismissal, the Court also recommends denial of Taylor's request for preliminary injunction as moot. *See Cambilargiu v. Bank of Am., N.A.*, No. 13-cv-190 (PAM/JSM), 2013 WL 12155363, at *2 (D. Minn. Apr. 16, 2013) (denying the plaintiffs' motion for preliminary injunction as moot after granting defendants' motion to dismiss).

**D.    Evidentiary Hearing**

Because the Court can resolve Taylor's Petition by relying on the record, an evidentiary hearing is not necessary. *Wallace v, Lockhart*, 701 F.2d 719, 729-30 (8th Cir. 1983) ("[D]ismissal of the habeas petition without a hearing is proper where . . . the dispute can be resolved on the basis of the record.") (citation omitted).

### III.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Petitioner Ephren White Taylor, II's Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 (Dkt. 1) be **DENIED**;

2.    Petitioner Ephren White Taylor, II's request for preliminary injunction be **DENIED AS MOOT**; and

3.    This action be **DISMISSED WITHOUT PREJUDICE**.


Dated: December 2, 2022             *s/Elizabeth Cowan Wright*
                                    ELIZABETH COWAN WRIGHT
                                    United States Magistrate Judge

**NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).